## UNITED STATES v. ELADE REALTY CORPORATION.

No. 69, Docket 20334.

Circuit Court of Appeals, Second Circuit.

Argued Oct. 10, 1946.

Decided Nov. 12, 1946.

Writ of Certiorari Denied Jan. 20, 1947.

Louis L. Tetelman and Tetelman & Tetelman, all of New York City (Louis J. Castellano, of New York City, of counsel), for appellant.

Mario Pittoni, of Brooklyn, J. Vincent Keogh, of New York City, U. S. Atty., E. D. (Vine H. Smith, of Brooklyn, Asst. U. S. Atty., of counsel), for appellee.

Before L. HAND, SWAN and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

The Elade Realty Company appeals from a judgment, convicting it under five out of twenty-eight counts of an information for violating that section of the Second

War Powers Act,[1] which makes it an offence to perform "any act prohibited * * * by * * * any * * * regulation," passed in pursuance of the President's powers conferred by the Act. The company's position is that the counts to which it pleaded did not allege facts constituting a crime. Each count alleged that on a day certain—varying between April 16th and August 24th—in the year 1945, the company sold a house on "Sullivan Road, Farmingdale, Town of Oyster Bay, County of Nassau, State of New York," at a price greater than that at which it had agreed to sell the house "even though the construction" of the house "had been made possible by priorities assistance * * * granted upon the condition and agreement" that the house would not be sold for more than the agreed price. The question is whether the regulations, in force at the time when the sales were made, were valid, which forbad a builder, who had received a grant of "priority" in materials, to sell at a higher price than that to which he had limited himself in his application, or for more than the "fair market price," or in any event for more than $6,000. The information did not allege when the company filed its applications for priority, when the "priorities" were granted, when the company began to use the materials so obtained, when it used the last of these in building, or what was the value of those used after February 10, 1943, a date which is important for reasons which will appear. All we know is that at the hearing upon sentence the company's president declared that the "construction job continued from March, 1942, to July, 1943." Until February 10, 1943, neither the National Housing Agency nor the War Production Board, had promulgated any regulation, setting any limit upon the price which a builder might charge for houses built with "priority" materials. On that day two regulations of the National Housing Agency went into effect, one of which enacted that "the total purchase price" of any building should be "a fair market price, or $6000, whichever is lower"[2]; and that houses "begun prior to February 10, 1943, shall be * * * sold * * * only in accordance with the provisions of the application."[3] The other regulation[4] set the same limit to the sale price,[5] and enacted that the "sales prices" of such houses "shall not exceed the respective maximum amounts permitted by the conditions of the application."[6] On February 12, 1943, a regulation of the War Production Board[7] also went in effect, which enacted that "owners" were "hereby ordered to comply with all the representations, certifications and promises made by said owner in the Application."[8] The chief point argued is that the Second War Powers Act[9] did not authorize the provisions just quoted from these regulations.

The Act[9] gave power to the President to allocate any materials of which there was a shortage "for the defense of the United States * * * upon such conditions and to such extent as he shall deem necessary or appropriate * * * in the public interest and to promote the national defense. Although, as we have seen, the regulations allowed prospective builders, who needed "priority" materials, to set their own prices, they held them to what they set, and they imposed as a further limit upon any sale "the fair market price," and never more than $6,000. It seems to us of no consequence whether this be called "price-fixing"; the only relevant question is whether the regulations were ancillary to the purpose of the Act. We hold that they were. Their primary object probably was to assure houses for those who were making munitions of war by directing such materials as were not needed for the actual manufacture of these, to the construction of cheap houses. Nobody can question that, so far as this was in fact the effect of the

---

[1] § 633(5), Title 50 U.S.C.A.Appendix.

[2] § 702.1(d) (4). N.H.A. General Order 60-2; 8 Fed.Reg. pp. 1829, 1830.

[3] § 702.4(b); N.H.A. General Order 60-2; 8 Fed.Reg. pp. 1829, 1830.

[4] N.H.A. General Order 60-3; 8 Fed. Reg. pp. 1830, 1831.

[5] 702.11(a) (2) (i).

[6] § 702.11(c) (1).

[7] Preference Rating Order P-55; 8 Fed.Reg. pp. 1951, 1952.

[8] § 1075.7(f).

[9] § 2(a) (2) of § 633, Title 50 U.S.C.A. War Appendix.

regulations, it implemented the Act, even under its narrowest interpretation: those who make weapons must have shelter, and the cheaper the shelter, the less drain upon the national resources. We cannot be entirely sure whether the regulations forbad all construction except of houses for "war-workers," and for this reason we shall assume that "priority" materials might be allotted to other houses. Even so, the limits imposed were such as "to promote the national defense"; for they made it certain that any building, even though not directly connected with the production of munitions, should be cheap; and that pro tanto limited the drain upon the total stock of available materials.

A more difficult question is whether the regulations were valid, if applied to houses built with materials procured under "priorities," obtained before February 10, 1943. It is true that this arises only in case we accept as part of the record the statement of the company's president which we quoted above; but, the prosecution made no objection to its consideration at the time, and we shall take it in amplification of the allegations of the information. Even then the situation does not become entirely clear. It is true that we must suppose that all five houses were actually under way before February 10, 1943, and that the company used some "priority" materials thereafter to complete them; but we do not know how close they were to completion, and it would be hard to find any practical difference between a completed house and one needing, for example, only a little more painting. We should not care to go on such a distinction, and we shall treat the case as though all the houses had been completed, on February 10, 1943. That the prohibition then added was not ex post facto legislation in the constitutional sense, follows from the fact that it applied only to sales made after its enactment, and that builders remained free to sell at the price to which they had originally agreed. Therefore, the only possible challenge to the validity of the regulations is that they deprived the builders of their liberty—or conceivably their property—by adding a criminal sanction to the enforcement of their promises. It would have been valid for Congress to set a limit, enforced by criminal sanctions, upon the price at which the houses could have been sold, even though the builders had not been obliged to obtain a "priority" in order to secure the materials that went into them. That would indeed have been true price-fixing, but it would have been valid, even if applied to houses already in existence, provided the owners were granted a fair opportunity to prove what was a fair price.[10] The Second War Powers Act and the regulations now before us do not provide such an opportunity except in so far as they secure to builders a "fair market price"; but no such opportunity and no determination of what is a "fair market price" were necessary when the builder fixed his own selling price in his application. He was under no compulsion to build at all; but, if he did, if he sought "priority" materials, and if he chose to take the risk that the price he fixed might not be large enough, certainly he could have no complaint that he was held to it. We need not consider what would be the result of an attempt to punish him for selling at the price he had fixed, if that was greater than the $6,000 limit, or a "fair market price." In all the counts the sale price was above the price fixed in the application; and there can be no doubt that in any event the regulations were pro tanto valid, if authorized by the Act, as we have held they were.

The company also raises the added point that the allegations in the information were too vague to be valid; but a mere glance at the "Forms" permitted by the Criminal Rules is answer enough. Moreover, this being an information, it could have been amended at any time, had the company felt any genuine need of further enlightenment. Rules 7(e) and 7(f).

Judgment affirmed.

---

[10] Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834.