NESSETH et al. v. CREEDON et al.
(SWARTZ, Intervener).

No. 2591 Civil.

United States District Court
D. Minnesota, Fourth Division.

Sept. 27, 1948.

Sheldon Karlins and Orville Freeman, both of Minneapolis, Minn., pro se and in behalf of Rollo Nesseth and intervener.

Victor E. Anderson, U. S. Atty., of St. Paul, Minn., and Hilburt Slosberg, Attorney Office of Housing Expediter, of Washington, D. C., for defendants Frank Creedon and Harold Farley.

David Shearer (of Shearer, Byard, Trogner & Peters), of Minneapolis, Minn., for defendant Madsen Construction Co.

NORDBYE, District Judge.

This cause came before the undersigned, one of the Judges of the above-named Court, on the following motions: (1) Plaintiffs' motion for a summary judgment in their favor and in favor of the intervener; (2) motion of defendants Creedon and Farley for an order dismissing the amended complaint and the complaint in intervention as to them, or, in the alternative, for an order granting them summary judgment; (3) the oral motion of the Madsen Construction Company for a summary judgment in its favor, said motion being made at the time of the hearing of the foregoing motions.

This proceeding has been before the judges of this Court on various motions, and the case has now progressed by reason of the affidavits heretofore filed, depositions, stipulations, admissions, etc., so that all parties view the record as one which does not present any genuine issue as to any material fact. For convenience, plaintiffs and the intervener will be referred to as the plaintiffs.

The following factual summation seems necessary to an understanding of the questions presented: In August, 1946, a number of veterans of World War II formed a corporation known as Veterans Housing Association of Minneapolis. This Association acquired a tract of land, platted it, and made arrangements with the defendant Madsen Construction Company to build the required houses on the land so acquired for the members of the Association. The title to the tract of land was registered in the name of the Madsen Construction Company by the Association and an agreement was entered into with the company called "Agreement Re Plan of Operation." In this agreement, each member of the Association covenanted to contribute some $500, which was to be used to purchase the land in question and the balance remaining to stand as a guaranty fund for the Madsen Company. This company agreed to build the required houses for the members of the Association in accordance with certain approved plans and specifications on the basis of cost plus a fixed fee per house, and to sell them upon completion to the designated members of the Association on that basis. Later, separate instruments designated by the parties as contracts for deed were entered into between the Madsen Company and the members of the Association, including each of the plaintiffs, wherein the particular house to be constructed for each of the parties was to be sold by the Madsen Company to each of the grantees on the basis of cost plus a fixed fee. These contracts were executed by the parties on or about November 27, 1946.

In October, 1946, pursuant to the Veterans' Emergency Housing Act of 1946, 60 Stat. 207, 50 U.S.C.A.Appendix, § 1821 et seq., and the Housing Expediter's Priority Regulation No. 5, the Madsen Company made application to the Housing Expediter for authorization to build 61 units on this tract of land and requested a priority allowance for the materials required and also that maximum sales prices be fixed. This application was approved on October

30, 1946, by defendant Harold Farley, Minnesota State Director of the Federal Housing Administration, to whom had been delegated such authority. The maximum sales prices of the houses in the project were fixed at $7,300 and $9,200, depending upon the type of house to be constructed. These plaintiffs agreed to purchase the type of house for which the maximum sales price was set by the Director at $9,200. It appears that the actual construction of these houses in this project commenced on or about October 10, 1946, and continued through the winter of 1946 and the spring of 1947. Then the Madsen Company became faced with increased construction costs because of a rise in the cost of materials, and for this reason it made application to the Housing Administration on June 18, 1947, for a revised ceiling price on all or substantially all of the houses in the project. When this application was made, the Director, as a matter of courtesy to the veterans' group, afforded the officers of the Veterans Association an opportunity to be heard on the question of the granting of the increase, and after defendant Farley had indicated that he proposed to approve the revised ceiling prices because of the showing made with respect to increased costs, objections of the officers of the Association were forwarded to the Washington office of the Expediter. That office considered the application and the objections thereto, and then approved the contemplated action of the Director of the Housing Administration. It was in July, 1947, that orders were entered by the Housing Administration establishing increases for some of the units, including those to be built for the plaintiffs. As to the plaintiff Karlins, a final maximum ceiling sales price was set at $11,417.25; as to Nesseth, $11,426; as to Freeman, $11,330, and as to intervener Swartz, $11,266. All of these houses were completed, or about to be completed, at the time the revised maximum ceiling sales prices were fixed.

The 1946 Act, however, was repealed as of June 30, 1947, and although the application for increases was filed by the Madsen Company before the Act was repealed, the final orders of the Housing Administration were not entered until July, 1947. And it is by reason of this repeal, as well as for other alleged grounds, that these plaintiffs contend that the Housing Administration acted without authority in assuming to issue revised maximum sales prices. They brought this action seeking to have the Court declare (1) that the purported orders of defendant Harold Farley and Frank Creedon increasing the maximum sales prices on houses purchased by the plaintiffs were made without warrant of law and that they be set aside as void and illegal; (2) that the Court restrain these defendants from issuing further orders increasing maximum sales prices on houses purchased by plaintiffs and constructed under the provisions of the Veterans Emergency Housing Program; (3) that the Court declare that any price heretofore exacted by the Madsen Construction Company above said original maximum sales price be refunded to the plaintiffs and that the Court restrain the defendant Madsen Construction Company from collecting a price for these houses above the maximum sales prices set on October 30, 1946; and (4) for such other and further relief as to this Court may seem just and equitable.

In repealing the 1946 Act, Congress provided in Section 1(a) of the 1947 Act, 50 U.S.C.A.Appendix, § 1881(a), as follows:

"(a) Sections 1, 2(b) through 9, and sections 11 and 12, of Public Law 388, Seventy-ninth Congress, are hereby repealed, and any funds made available under said sections of said Act not expended or committed prior to the enactment of this Act are hereby returned to the Treasury: Provided, That any allocations made or committed, or priorities granted for the delivery, of any housing materials or facilities under any regulation or order issued under the authority contained in said Act, and before the date of enactment of this Act, with respect to veterans of World War II, their immediate families, and others, shall remain in full force and effect."

The effect of the repeal of the 1946 Act on the authority of the Housing Expediter and the Housing Administration to issue revised maximum sales prices on homes constructed under the Veterans' Emergen-

cy Housing Act of 1946 requires a consid-eration of some of the provisions of that Act and the regulations issued thereunder. In this connection, however, it should be noted that, in the 1946 Act, Congress pro-vided that all regulations and orders is-sued under that Act should not terminate until December 31, 1947, unless prior to that date there was a concurrent resolution of both Houses of Congress declaring that the provisions of the Act are no longer necessary to deal with the existing nation-al emergency. This section of the Act reads:

"Sec. 1. (b) The provisions of this Act, and all regulations and orders issued there-under, shall terminate on December 31, 1947, or upon the date specified in a con-current resolution by the two Houses of the Congress, declaring that the provisions of the Act are no longer necessary to deal with the existing national emergency, whichever date is the earlier."

And there was also incorporated in the 1946 Act the following:

"Sec. 5. * * * Notwithstanding any termination of this Act as contemplated in section 1(b) hereinabove, the provisions of this Act, and of all regulations and or-ders issued thereunder, shall be treated as remaining in force, as to rights or liabili-ties incurred or offenses committed prior to such termination date, for the purpose of sustaining any proper suit, action, or prose-cution with respect to any such right, lia-bility, or offense."

The 1946 Act was primarily directed to expediting the availability of houses for veterans. It proposed to do this by the allocation of priorities for critical materi-als needed for the building of suitable homes for veterans and to curb the exces-sive cost of new housing by establishing a maximum ceiling sales price for housing accommodations erected in pursuance thereof. Under Section 3 of the Act, the Expediter was authorized to act when "sales prices of housing accommodations the construction of which is completed aft-er the effective date of this Act have risen or threaten to rise to an extent or in a manner inconsistent with the purposes of this Act, he may by regulation or order

establish maximum sales prices for such housing accommodations."

Section 4(a) of the Act provided for the establishment of material priorities.

"Whenever in the judgment of the Ex-pediter there is a shortage in the supply of any materials or of any facilities suitable for the construction and/or completion of housing accommodations * * * he may by regulation or order allocate, or estab-lish priorities for the delivery of, such ma-terials or facilities in such manner, upon such conditions, and to such extent as he deems necessary and appropriate in the public interest and to effectuate the pur-poses of this Act."

On August 27, 1946, the Housing Expe-diter issued HEPR 5, entitled "Priorities Regulations Under Veterans' Emergency Housing Act of 1946." This regulation assumed to cover in a detailed manner the various provisions regarding priorities as-sistance and the circumstances under which applications would be approved, and vari-ous conditions and limitations, all directed to the furtherance of the purposes of the Act. Among other things, it provided that "An applicant may apply by letter in tripli-cate to the Federal Housing Administrator (or other agency with which the applica-tion was filed) for an increase in the sales price * * * before the house is sold (i. e., before title has passed) * * *." It was under Regulation 5 that the Madsen Company made its initial application for priorities and the setting of a maximum sales price, as well as its application for an increased maximum sales price in view of the mounting material costs which it en-countered during the construction of the houses after the initial maximum sales price had been fixed. Although there is a provision in Section 3 of the Act for an applicant to apply for a revision of the maximum sales price previously certified, both the Housing Expediter and the Di-rector of the Housing Administration as-sert herein that no regulations were prom-ulgated under that section and that HEPR 5 was promulgated under Section 4(a) of the Act, that is, in pursuance of the prior-ities and allocation powers of the Expe-diter, and that when the Madsen Company made its application for increases in maxi-

mum sales prices it proceeded in pursuance of Regulation 5 and the Housing Administration accepted the application under that regulation. However, the plaintiffs earnestly contend that the Director of the Housing Administration had no authority to grant any increases in the maximum sales price on the application of the Madsen Company because (1) the 1946 Act had been repealed when the increases were granted and no authority remained in the Expediter or Director to take such action; (2) that the maximum sales prices were illegal to the extent that the prices fixed exceeded $10,000; (3) the increased maximum sales prices were invalid because the first sale of the houses had been made, and in view of that fact no authority rested in the Housing Administration to entertain an application for increased maximum sales prices.

It is plaintiffs' position that there was no reservation of authority in the Expediter and Director in the repealing provisions found in the 1947 Act to justify any retention of authority on their part to grant increases in maximum sales prices because that Act only provided that the allocations made or committed or priorities granted for the delivery of housing materials or facilities with respect to the veterans of World War II, their immediate families, and others, should remain in full force and effect; and that the remainder of the Act regarding the determination of maximum sales prices and the allowance of increased maximum sales prices did not survive.

At first blush, there might seem to be some force to plaintiffs' contention. But analyzing the situation and giving due effect to the rulings, interpretation, and construction of the Housing Expediter with reference to the questions involved would seem to remove any doubt as to the duty of the Court in the matter. Concededly, HEPR 5 was issued under the priority and allocation section, 4(a). The Housing Expediter was called upon to carry out the provisions of the 1946 Act in a way not dissimilar from the activities pursued by the War Production Board and the Civilian Production Administrator in the allocation of scarce materials during the war. That the Expediter had the authority to curb excessive sales prices of houses constructed by priority materials allocated under Section 4(a) seems clear. Such right is not only ancillary to, but implemented in, the very purpose of Congress in clothing the Expediter with authority to establish priorities for the delivery of materials suitable for housing accommodations. United States v. Elade Realty Corp., 2 Cir., 1946, 157 F.2d 979; K & J Markets v. Bowles, D.C.N.J. 1944, 57 F.Supp. 294, affirmed 3 Cir., 148 F.2d 661; United States v. Ashley Bread Co., D.C.W.Va., 59 F.Supp. 671. Undoubtedly, the Expediter could have proceeded in the establishment of maximum sales prices under Section 3 of the Act. But the authority vested under that section does not negate the right of the Expediter to take similar action where priority materials are used in the building of housing accommodations. Under the saving clause found in the 1947 repeal, it would seem to follow that, if allocations have been made or priorities granted for the delivery of any housing materials or facilities under authority of the 1946 Act, and if such action is to remain in full force and effect, all of the acts of the Housing Administration and authority with reference to, and in connection with, the granting of priorities should, likewise remain in full force and effect. The Housing Expediter emphasizes that HEPR 5 necessarily remained in full force and effect as a regulation until December 31, 1947, in view of the many homes that were being constructed throughout the Nation through priorities assistance granted by the Housing Administration. And in order that the Veterans' Housing Program should not entirely collapse, it would seem that Congress must have recognized that, under the reservation made in the repealing section of the 1947 Act, the Housing Administration would be required to continue during 1947 its supervision and authority as contemplated by HEPR 5. For instance, the regulation provides that where priorities were granted to builders in erecting dwellings for veterans, there were to be from time to time construction inspections and the applicant was required to report

to the Federal Housing Administration as to the progress made in the construction of the dwelling, and the Federal Housing Administration was required to make an inspection of the house after the dwelling had been enclosed, roofed, etc., for the purpose of determining whether the construction conformed to the plans and specifications. These conditions, as well as others to be found in the regulation which governed the allocation of priority materials, demonstrate that if the Housing Administration was to finish that which had been instituted under its authority and prevent the utter failure of the entire program, with the maintenance of maximum sales prices of houses under construction for the veterans, adjustment for increased construction costs to the builder was an essential and integral part of the allocation and priority commitments which had been made.

Defendants call attention to the hearings before the House Committee on Banking and Currency, 80th Congress, pp. 226, 227, on H. R. 2549, a proposed bill which contained the same language as Section 1(a) of the 1947 Act and which later was reenacted in a substitute bill which became the Housing and Rent Act of 1947. The following is an excerpt from the testimony of Raymond F. Foley, Administrator of the National Housing Agency, which sets forth the colloquy between him, Committee. Chairman Wolcott and Congressman Monroney, and which tends to support the position of the Housing Administration herein:

"Mr. Monroney. One other question. Mr. Chairman, do you consider that this bill will take the ceilings off HH houses?

"The Chairman. There is a provision in the bill which protects the commitments, already made, up to the effective date of the act. It would not affect any commitments made after that date.

"Mr. Monroney. In other words, the ceilings on houses built with HH priorities would be left as it is now, which gives you the right, Mr. Foley, to adjust those ceilings up for increased costs of construction where the builders make a case that their construction costs have increased; is that right?

"Mr. Foley. That has been our practice in the past, and as I understand, this refers to contracts entered into. I have assumed that that meant the agreement between the builder and the governmental agency that in return for priority aid certain rent ceilings would be applied, or certain sales ceilings would be applied.

"The Chairman. I might say for the record now that it is intended to cover any agreement or any commitment made by anyone, which was made under the Patman Act.

"Mr. Foley. That would leave us then in the situation that you mention, Congressman Monroney.

"Mr. Monroney. Well, you would feel that it would be not good for the Government or the veteran to take ceilings off these HH houses, that were built with this priority aid, and on which an agreement had been made by the builder to sell at a ceiling price, as fixed by the Federal Housing Administration on adjustment; is that right?

"Mr. Foley. Our position in maintaining that control, when the changes were made in the latter part of last year, was on that basis, that it was an agreement under which certain benefits were supposed to flow both ways and should be maintained.

"Mr. Monroney. And the only case in which you cannot give proper relief is on the very small number of houses that might go over your $11,500 figure; is that right?

"Mr. Foley. We can go over the figure, if the hardship justifies it upon showing.

"Mr. Monroney. In other words, there is no limit, then? Whenever the hardship is shown, you can grant relief on and fix a higher price ceiling, when the case is proven to you that building costs have gone up so that the builder is protected all the way through on his advance in costs.

"Mr. Foley. Yes. .

"Mr. Monroney. You merely limit him under these HH priorities to the fixed percentages that he agreed to, as his profit, at the time he received the HH contract."

If, in the granting of priorities to a builder, he is to be bound by the initial maximum sales price after the repeal of the Act, and no authority rests in the

Housing Expediter to relieve him because of increased costs of construction over which he has no control, it would seem to follow logically that the repeal also vitiates the initial maximum sales price and the veteran is without the benefit of any curbs on the selling price of houses erected by reason of priorities assistance through the Housing Administration. Such an absurd situation should not be entertained if there is any rational basis for a contrary holding.

There seems to be an absence of any substance to plaintiffs' contention that defendant Farley exceeded his authority in granting increased maximum sales prices on the homes in question in excess of $10,000. Section i(6) of HEPR 5, covers "Requests for increases in sales prices and rents because of increased costs." In that section of the regulation, there is a provision with reference to increases in sales price on one family dwellings which provides, "However, no increase in sales price to an amount more than $10,000 * * * will be granted except where unusual hardship would result to the applicant for the increase." In view of that recital, it seems clear that, when the Expediter would be asked to consider requests for an increase in sales price in excess of $10,000 for a single unit dwelling, due showing had to be made, not only that costs had increased beyond the control of the builder, but that unusual hardship would result unless the increase was granted. In other words, it was indicated that a strong showing of unusual hardship had to be sustained before any increase would be permitted above the $10,000 figure. But that the Housing Expediter could grant an increase upon a proper showing above the $10,000 figure seems obvious . However, an amendment to HEPR 5 was promulgated, effective December 13, 1946. This amendment likewise contained a Section i(6) and it likewise provided for requests for increases in sales price because of increased costs, but the provision regarding the necessity for showing "unusual hardship" as a condition for an increase above the $10,000 figure was omitted and no reference was made to any increase in maximum sales

prices above $10,000. This amended section reads in part:

"* * * The increase will not be approved unless it can be shown that he has incurred additional or increased costs in the construction over which he had no control, and which could not reasonably have been anticipated by him at the time of the initial application, * * * and that these increased or additional costs will make it unreasonable to require him to sell * * * at the price * * * approved in the application. No increase in sales price * * * will be granted in excess of the increase in construction costs, * * *."

There is no reason to assume that, by the change noted in the amendment, it was intended to deprive the Housing Administration of the authority to increase the maximum sales price above the $10,000 figure if the showing warranted such action. In fact, it would seem that the Housing Expediter eliminated the "unusual hardship" condition so that his action in increasing the maximum sales price above the $10,000 figure would not be unduly restricted. The Expediter who promulgated the amended regulation has construed the provisions which he enacted to the effect that the Housing Administration had the authority to approve the maximum sales price above the $10,000 figure for a single dwelling if the applicant makes the showing required by the amended HEPR 5. Consequently, under all the circumstances, the construction of the amended regulation by the Expediter should not be disturbed by this Court. His construction seems entirely sound, sensible, and reasonable.

Attack is also made on the Housing Expediter's action in increasing the initial maximum sales price because it is contended that the houses in question had been sold and title had passed before any applications were made for the increases. HEPR 5 issued on August 27, 1946, states that applications for maximum sales increases must be made "before the house is sold (i. e., before title has passed)." The amendment to this regulation effective December 13, 1946, with reference to the same subject matter merely states the condition as "before title to the dwell-

ing has passed." It may be noted that Section 3(b) (3) of the 1946 Act, which also has provisions regarding the granting of increases has the condition ."at any time before the first sale." In view of these provisions, plaintiffs assert that the increases granted by the Housing Administration were invalid because the sales to the plaintiffs had been made at that time and that they at least held an equitable title, by reason of their contracts for deed, to the premises in question when the increases were applied for and when they were granted. These regulations were promulgated to guide the administration of the Act throughout the entire Nation and one must not be too legalistic, therefore, in assuming to limit unduly the Housing Administration in its interpretation of a regulation which was designed for the various States in the Union where the different States have different views as to the interest that grantees may acquire under contracts between grantors and grantees involving the sale of real property. No doubt one of the objects of the Act and of the regulation was to deny any increase to a builder after the legal title had passed from the builder to the purchaser. The reason for that seems obvious. And it may be that, under an ordinary contract for deed where the builder had bound himself to sell the property to be constructed according to agreed plans and specifications for a fixed price, regardless of any increased costs of labor and material that might arise in the future, under such circumstances the Housing Administration would not permit an increase in the maximum sales price. United States v. Schroeder, 7 Cir., 1947, 164 F.2d 647. But in the present situation, however one may classify the contract between the plaintiffs and the Madsen Company, the plaintiffs agreed to purchase these houses on a cost plus a fixed fee basis. By their very contracts, they recognized and agreed that the contractor should not gamble on the market price of labor and material that would be involved in the construction of their homes. When they entered into these contracts, they knew, or were bound to know, that the law and the regulation promulgated there-

under provided that the builder with priority material could apply for increased maximum prices if the circumstances warranted it. Although a contract for sale had been entered into between this builder and these purchasers, the determination of the consideration had not been computed and that could not be computed until the construction costs of the contractor were available. Presumably, under the laws of Minnesota, these plaintiffs may have held an equitable title to the premises purchased by them. But no violence would be done to the contract rights between the parties by the Housing Administration's grant of an increase in the maximum sales price. Legal title still rested in the builder and before the purchasers could obtain the limited warranty deed which the builder agreed to provide, they would be required to compute and then pay all of the costs of construction, plus a fixed fee for the builder. Therefore, when one speaks of the first sale, or when title has passed, with regard to the authority of the Housing Administration to grant increases in the maximum sales price, due consideration must be given to the particular situation which confronted the Housing Administration. The action in granting increased maximum sales prices by the Housing Administration in the present situation and in view of the contract between the parties, was entirely consistent with the arrangement that the parties themselves had made for the purchase of these houses under construction. And in carrying out the provisions of this Act, it was for the Expediter in his discretion to determine whether the first sale had been made and whether title had passed within the meaning of the Act and the regulation. Plaintiffs are in no position to complain of the action of the Housing Administration in view of their contracts. They surely do not expect to get their homes at cost or less than cost without any profit to the builder. It is inconceivable that Congress intended to prevent a builder from obtaining his construction costs in the sale of housing accommodations built with priority materials when the increased costs are not due to the fault of the builder and when an increased sales

price will not conflict with the terms of the first sale of the house under consideration.

But perhaps the decisive and controlling question arises on these motions in determining whether or not the Court has jurisdiction to grant the relief which plaintiff seeks. While there was at one time in these proceedings considerable confusion as to the claimed basis of jurisdiction relied upon by these plaintiffs, it has now been unequivocally settled that they exclusively rest their entire claim to jurisdiction of this Court on Section 6 of the 1946 Act. They have abandoned any claim to jurisdiction under the Federal Declaratory Judgments Act. Section 6 reads:

"Any person who is aggrieved by any action taken pursuant to any regulation or order issued under the authority of this Act may petition the district court of the district in which he resides or has his place of business for a review of such action, and such district court shall have jurisdiction to enjoin or set aside, in whole or in part, such action or to dismiss the petition. No such action shall be enjoined or set aside, in whole or in part, unless the petitioner establishes to the satisfaction of the court that such action is not in accordance with law, is unsupported by competent, material, and substantial evidence, or is arbitrary or capricious."

Assuming, without deciding, that this section survives under the provisions of Section 5 of the 1946 Act heretofore quoted, the Court then is squarely confronted with the question as to whether or not these plaintiffs are persons aggrieved within the meaning of this section so as to be of a class who are permitted to invoke the jurisdiction of this Court under the circumstances herein and obtain a judicial review of the action of the Housing Administration. The contracts between plaintiffs and the Madsen Construction Company are private contracts between two parties with reference to the purchase of certain houses which were then under construction. These contracts in so far as any recital contained therein is concerned, are in no way connected with, or related to, the Veterans' Emergency Housing Act of 1946, or any regulation promulgated thereunder. When the Madsen Construction Company applied to the Housing Administration for priority materials and maximum sales prices on the houses which it contemplated erecting, there was no contract of purchase between these plaintiffs and the builder. It must be clear that at that time these plaintiffs had no right to proceed under Section 6 as aggrieved parties to invoke the jurisdiction of this Court with reference to the initial maximum sales price fixed by the Housing Administration. True, if the builder exacted from the plaintiffs more than the maximum price permitted by the Act when these houses were sold to them, they would be granted relief under Section 7 (d) of the Act, which provides that if the seller violates a regulation or order prescribing the maximum selling price under the Act, then such purchaser can bring an action within one year after the occurrence for the amount by which the consideration exceeded the maximum selling price. But that right would seem to be the only right which would inure to a purchaser of property built by the priorities assistance of the Housing Administration. There would be no purpose in permitting prospective purchasers to contest maximum price increases which would only result in an endless stream of appeals by persons who might not be affected thereby. That is, if prospective purchasers are not satisfied with the selling price offered by the builder, and which price reflects the maximum ceiling price set by the Housing Administration, they are not obliged to buy, and if they do buy, and it appears that the price exacted exceeds the maximum, then, under Section 7(d), they have ample recourse against the seller. Whatever price the Housing Administration fixes as the maximum sales price of housing accommodations, prospective purchasers are not required to act on any order made by the Administration under such circumstances. Purchasers of property constructed with priority material have certain contract rights which determine the consideration they are to pay for the property, which cannot be more than the maximum sales price es-

tablished by the Housing Administration, and the Expediter's rulings do not affect any remedy which they may have against the seller under their contracts or under the Act in any court of competent jurisdiction. And it may be pointed out in passing that as yet there has been no showing as to the cost of plaintiffs' property under the contract between them and the builder. That must be determined according to their private arrangement irrespective of what the Housing Administration may have done. The final cost, according to the formula agreed upon, may be less, or it may be more than the maximum set by the Housing Administration. If it is more, it cannot be exacted by the builder. The computation under the formula set up in the contract for deed may be an entirely different process and method of computation and result in an entirely different cost figure than that which has been approved by the Director in establishing the maximum sales prices. It appears that Karlins, Freeman and Swartz have never taken possession of the houses built for them and have made no payments on their contracts for deed except the initial $500 paid to the Association. Nesseth has moved into his house and is paying at the rate of $75 per month since he entered possession.

Plaintiffs rely on Parker v. Fleming, 329 U.S. 531, 67 S.Ct. 463, 91 L.Ed. 479, as authority for their right to obtain a judicial review of the action of the Housing Administration herein. But that case must rest on its own facts and on the regulations which govern the right of a tenant to appeal from an order of the Price Administrator in issuing a landlord authority to institute eviction proceedings in State Court against the tenants. There, the tenants were directly subject to the order of the Administrator. The only place they could challenge his order was in the Emergency Court of Appeals. The Veterans' Emergency Housing Act of 1946, however, in no way requires veterans to act on a maximum sales price set by the Housing Administration. That is, a prospective purchaser in his dealings with a builder may accept or reject any maximum sales price estab-lished by the Administration. He is not required to purchase any house if he believes that the price is too high. In other words, the ultimate price which these plaintiffs pay for the property in question is a private contract matter between them and the Madsen Company. The maximum sales price set by the Housing Administration is not necessarily the selling price of the property.

In a legal sense, therefore, it seems indisputable that these plaintiffs have not been aggrieved by any action taken by the Housing Administration and are not entitled to a judicial review thereof. A consideration of the purposes of the Act and its practical administration would also seem to require this view. If plaintiffs' position is sound, the confusion and uncertainty which would confront every builder who had constructed, or was about to construct, housing accommodations in reliance upon the Housing Administration's establishment of a maximum sales price, is apparent. The interpretation sought by plaintiffs permitting every contract purchaser to reopen the entire proceedings with reference to the propriety of orders establishing the original and/or increased maximum sales prices would tend to demoralize the entire administration of the Act and frustrate the accomplishment of the very purpose for which Congress enacted it in attempting to expedite the availability of housing accommodations. In view of the tenuous contract rights which would exist and the uncertainty as to obtaining his costs, no builder with any degree of safety could undertake the building of homes with priority assistance.

In passing it may be pointed out that Section 6 of the 1946 Act provides that the action of the Housing Administration shall not be enjoined or set aside in whole or in part unless the petitioner establishes to the satisfaction of the Court that the action complained of is not in accordance with law, is unsupported by competent, material and substantial evidence, or is arbitrary and capricious. The showing made herein by Director Farley as to the factual basis in support of the increases allowed in the maximum sales price of these properties is uncontradicted. Indeed, there

does not seem to be any contention to the contrary on these motions for summary judgment; at least, plaintiffs have not attempted to make any showing to contradict the showing of the Housing Administration in this regard.

In view of the premises, it does not become necessary to indulge in any lengthy discussion as to the jurisdiction which plaintiffs could invoke under Section 6 as against the defendant Madsen Construction Company. If any jurisdiction does exist under that section to grant plaintiffs relief by reason of the action taken by the Housing Administration, this Court would not be authorized to determine the rights of the parties under a private contract. That is a matter which must be relegated to a court of competent jurisdiction and not in a proceeding under Section 6.

██ The Court finds, therefore, that plaintiffs are not entitled to invoke the jurisdiction of this Court under Section 6 of the Veterans' Emergency Housing Act of 1946, and the Court further finds that if jurisdiction does exist under that section, the action of the Housing Administration in granting maximum sales prices above the $10,000 figure for the premises in question should not be set aside in whole or in part, because such action is in accordance with the applicable law and authority vested in the Housing Administration thereunder, is supported by competent, material and substantial evidence, and is not arbitrary or capricious.

The motion of plaintiffs for a summary judgment in their favor and in favor of the intervener must be denied. It is so ordered.

And it appearing that there is no genuine issue as to any material fact as between plaintiffs and the defendants Creedon and Farley, their motion for a summary judgment must be granted. It is so ordered. In view of the granting of their motion for a summary judgment, it is not necessary to pass upon their motion to dismiss.

The Court having found that defendants Creedon and Farley are entitled to a summary judgment and that the Court

has no jurisdiction under Section 6 to proceed in this matter, it must follow that the oral motion made by Madsen Construction Company for a summary judgment in its favor should likewise be granted. It is so ordered.

Exceptions are allowed.